IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs March 1, 2019

IN RE CYNTHIA P. ET AL.

**Appeal from the Juvenile Court for Hamblen County**
**No. J140087 Janice Hope Snider, Judge**

_____

**No. E2018-01937-COA-R3-PT**

_____

In this parental termination case, the juvenile court found four statutory grounds for termination of a mother's parental rights and that termination of parental rights was in her children's best interest. We conclude that the record contains clear and convincing evidence to support all four grounds for termination of parental rights and that termination of parental rights is in the children's best interest. So we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR., J., and J. STEVEN STAFFORD, P.J., W.S., joined.

Gerald T. Eidson, Rogersville, Tennessee, for the appellant, Angel M.

Herbert H. Slatery II, Attorney General and Reporter, and Jeffrey D. Ridner, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

**I.**

**A.**

When the Tennessee Department of Children's Services ("DCS") first became involved with Angel M. ("Mother") and her two children, Cynthia, born January 2002, and Delia, born June 2007, they lived with Delia's father, Brandon L. ("Father"). On July 24, 2014, law enforcement intervened in an altercation between Mother and Father, who had a history of domestic violence and drug abuse, in a Walmart parking lot. Both

children were present. Neither parent had a valid driver's license, and both admitted to recently smoking marijuana. Father was arrested immediately for driving on a suspended license, violation of the financial responsibility law, and two counts of child abuse and neglect. Later, after testing positive for marijuana and methadone, Mother was also arrested on two counts of child abuse and neglect. DCS took the children into protective custody.

DCS created a permanency plan with the goal of "return to parent" or "exit custody with relatives." Mother disclosed to DCS that she had been using illegal drugs for fourteen years and had at least two prior drug-related convictions. The children also reported concerns about Mother's mental health. So, among other things, the plan required the parents to resolve their legal issues, participate in domestic violence and parenting classes, submit to assessments for both alcohol and drug use and mental health, follow the recommendations of the assessments, pass random drug screens, maintain a legal source of income, and provide evidence of appropriate housing.

The juvenile court subsequently adjudicated the children dependent and neglected based on the parents' incarceration and drug use. By late August 2015, Mother and Father substantially completed the plan requirements. So the court authorized a trial home placement. In November 2015, after a successful trial placement, the court restored full custody to the parents.

Sadly, DCS's involvement with this family did not end there. On March 21, 2017, DCS received a report that the children lacked supervision, had been exposed to drugs, and were often late to school. A DCS investigator interviewed the children at school and learned that once again the children had been exposed to domestic violence and drug use. The family lived in a hotel, and the children sometimes went days without food. When the investigator attempted to interview the parents, Mother refused to cooperate. So DCS sought court assistance, which ordered the parents to cooperate with the investigation.

Further investigation revealed that, between March and July 2017, the family lived in hotels and, at times, in their car. Physical violence between the parents was commonplace. The parents spent money on marijuana and suboxone rather than food, often leaving the children hungry. The children also missed multiple medical appointments and needed glasses. The oldest child failed ninth grade due to excessive absences.

On July 18, 2017, in the Juvenile Court for Hamblen County, Tennessee, DCS petitioned for temporary legal custody of the children. On July 20, 2017, the children were removed from the parents' custody and placed by DCS with their maternal aunt and uncle.

On August 9, 2017, with the parents' participation, DCS created a new permanency plan, which bore a striking resemblance to the plan created in 2014. Again, the goals were return to parent or exit custody with relatives.[1] The plan addressed the parents' drug abuse, domestic violence, mental health, and homelessness issues. As before, the plan mandated completion of alcohol and drug assessments and compliance with any recommendations, negative drug screens, and submission to pill counts and copies of any prescriptions. Also as before, the plan required the parents to participate in domestic violence classes, to avoid new criminal charges, and to comply with any probation requirements. They also needed to complete mental health and psychological assessments. And again, the parents were asked to provide evidence of a legal source of income and an appropriate home for the children.

On September 13, 2017, at the adjudicatory hearing, Mother and Father stipulated that the children were dependent and neglected due to drug abuse and homelessness. Mother and Father were incarcerated for drug possession shortly after the children entered foster care. Upon their release, the case manager offered to help them obtain housing. Because the parents were not eligible for public housing, the case manager focused on helping Father find employment. She provided him with local job listings and discussed creating a budget. Mother was not interested in searching for employment; she had applied for disability benefits. The case manager also gave them information about area homeless shelters and food banks.

The case manager worked with the parents to schedule domestic violence classes and the necessary assessments. Both parents started domestic violence classes, and Father completed an alcohol and drug assessment. But Mother proved uncooperative. The case manager provided Mother with the means to schedule her assessment and reminded her repeatedly. She even offered to sit with Mother and help make the call. After these efforts failed, the case manager asked the provider to call Mother directly. Still Mother did not respond. In September and October, Mother failed multiple drug screens. Also in October, she was convicted of drug possession and public intoxication.

In January 2018, Father, now employed, rented an apartment. But the couple was evicted at the end of April. According to Father, Mother's erratic behavior led to the eviction. Mother had still not addressed her mental health or drug addiction. The case manager reported that, during a visit with the children in January, Mother acted strangely, repeating phrases and locking herself in her room. Although she had completed a dual assessment for substance abuse and mental health, Mother had not followed the recommendations from the assessment. Mother's assessment recommended outpatient therapy focused on anger management and parenting, completion of domestic violence

---

[1] In February 2018, the plan's goals changed to exit custody with relative or adoption. The plan requirements remained largely the same.

classes,[2] and a full psychological evaluation. Mother and Father also continued to fail drug screens. In April, Mother was twice arrested on drug-related charges.[3]

In May, Mother was incarcerated again but released in time for the May 21 permanency hearing. At the hearing, the court found that the parents were not in compliance with the plan. Mother and Father were arrested at the hearing on outstanding warrants. Throughout April, May, and June, the case manager attempted to help Mother gain admission to an inpatient drug treatment program. But each time the case manager found an opening, Mother failed to follow up.

The court awarded the parents a minimum of four hours of supervised visitation each month. But they often arrived late to scheduled visits, if at all. The children reported that the visits were tense. The oldest child chose not to participate in March, April, and May to avoid the stress.

On June 5, 2018, DCS petitioned to terminate the parental rights of Mother, Father, and Joseph P., the father of Cynthia.[4] The petition alleged four grounds for termination of Mother's parental rights: (1) failure to manifest an ability and willingness to parent; (2) abandonment by failure to provide a suitable home; (3) substantial noncompliance with the permanency plan; and (4) persistence of conditions.

On June 20, Father told the case manager that Mother needed medical help. The case manager redoubled her efforts to locate an appropriate inpatient treatment program. But again, Mother failed to follow through. In late June and again in early July, Mother was incarcerated. In July, Mother and Father separated. On July 10, the case manager told Mother of an opening at Serenity House. At first, Mother refused to go. But after another failed drug screen, Mother agreed. On July 13, the case manager helped Mother complete the intake call and transported her to the treatment facility. On August 13, 2018, Mother completed the program.

After completing the inpatient treatment program, Mother spent a week in a halfway house. But on August 19, she was asked to leave. Mother claimed that her departure was due to a misunderstanding about a soda. Although the case manager offered to look for space at another halfway house, Mother chose to live in a homeless shelter instead.

---

[2] The parents had never completed their domestic violence classes.

[3] On April 15, Mother was arrested for public intoxication, resisting arrest, and drug possession. On April 28, she was arrested for drug possession.

[4] Joseph P. was not located until shortly before the petition was filed. He responded to the petition by waiving his right to participate in the trial and indicating his desire to waive his parental rights.

B.

On August 29, 2018, the court conducted a trial on the petition to terminate. Shortly after the trial began, Father voluntarily surrendered his parental rights.

Cynthia, the oldest child, described to the court the stark contrast between life with Mother and Father and life with her maternal aunt and uncle. With Mother, she "spent years of [her] life sheltering [her] little sister from things that were going on around [them]." She listened to "hours upon hours of yelling" and witnessed both "mental and physical abuse." She spent nights wondering when her parents would come home. At school, she was preoccupied with whether "we were going to have food to eat or a place to sleep." She asked strangers for money for food. She began cutting herself because she thought her parents' behavior was her fault.

In foster care, Cynthia no longer worried about having enough food or where she and her sister would sleep. Her aunt and uncle provided stability and love. Her grades had risen dramatically. She participated in the ROTC program after school and logged four hundred community service hours. And it had "been exactly a year and twenty days" since she tried to harm herself. She was happy to be a teenager again instead of shouldering the responsibility of parenting her sister.

Cynthia asked the court to terminate Mother's parental rights to her and her sister. She had no faith that Mother had changed. "There was a point in time when I thought that things were going to get better" but then "it's gone back to the way it was." And when she tried to talk to Mother about her feelings, Mother changed the subject or refused to listen. The maternal aunt and uncle loved the children and desired to adopt them. She told the court that she and her sister wanted to be adopted.

For her part, Mother blamed her current situation on Father. Contrary to the case manager's testimony, Mother claimed that she never had any direct contact with DCS. All information was filtered through Father. And she was utterly dependent on Father for access to a telephone and a car. Without his cooperation, Mother maintained that she could not fulfill her plan responsibilities.

Mother asserted that termination of her parental rights was not in the children's best interest. She was their mother. She pointed to her recent sobriety as evidence of her willingness to parent. Five days before trial, Mother had her first clean drug screen. After the trial, she planned to take her medication and participate in therapy. She had recently been hired at Arby's, her first job in two years, and hoped to start work soon. If all went well, she estimated that she would be able to care for her children in six to eight months.

The juvenile court found that DCS had proven all alleged grounds for termination of Mother's parental rights by clear and convincing evidence. The court further found clear and convincing evidence that termination of Mother's parental rights was in the children's best interest.[5]

## II.

A parent has a fundamental right, based in both the federal and State constitutions, to the care and custody of his or her own child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995). But parental rights are not absolute. *In re Angela E.*, 303 S.W.3d at 250. Our Legislature has identified those circumstances in which the State's interest in the welfare of a child justifies interference with a parent's constitutional rights. *See* Tenn. Code Ann. § 36-1-113(g) (Supp. 2018).

Tennessee Code Annotated § 36-1-113 sets forth both the grounds and procedures for terminating parental rights. *In re Kaliyah S.*, 455 S.W.3d 533, 546 (Tenn. 2015). Parties seeking termination of parental rights must first prove the existence of at least one of the statutory grounds for termination listed in Tennessee Code Annotated § 36-1-113(g). Tenn. Code Ann. § 36-1-113(c)(1). If one or more statutory grounds for termination are shown, they then must prove that terminating parental rights is in the child's best interest. *Id.* § 36-1-113(c)(2).

Because of the constitutional dimension of the rights at stake in a termination proceeding, parties seeking to terminate parental rights must prove both the grounds and the child's best interest by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citing Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 808-09 (Tenn. 2007); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002)). This heightened burden of proof serves "to minimize the possibility of erroneous decisions that result in an unwarranted termination of or interference with these rights." *Id.* "Clear and convincing evidence" leaves "no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992). It produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established. *In re Bernard T.*, 319 S.W.3d at 596.

On appeal, we review the trial court's findings of fact "de novo on the record, with a presumption of correctness of the findings, unless the preponderance of the evidence is otherwise." *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013); Tenn. R. App. P.

_____

[5] The court also found clear and convincing evidence of at least one ground for termination of Joseph P.'s parental rights and that termination of his parental rights was in the child's best interest.

13(d). We then "make [our] own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim." *In re Bernard T.*, 319 S.W.3d at 596-97. We review the trial court's conclusions of law de novo with no presumption of correctness. *In re J.C.D.*, 254 S.W.3d 432, 439 (Tenn. Ct. App. 2007).

## A.

Mother does not challenge the grounds for termination of parental rights relied on by the court. Nonetheless, we must "review the trial court's findings as to each ground for termination . . . regardless of whether the parent challenges these findings on appeal." *In re Carrington H.*, 483 S.W.3d 507, 525-26 (Tenn. 2016).

### 1. Abandonment by Failure to Provide a Suitable Home

One of the statutory grounds for termination of parental rights is "[a]bandonment by the parent." Tenn. Code Ann. § 36-1-113(g)(1). The statute provides "five alternative definitions for abandonment as a ground for the termination of parental rights." *In re Audrey S.*, 182 S.W.3d 838, 863 (Tenn. Ct. App. 2005); *see also* Tenn. Code Ann. § 36-1-102(1)(A) (Supp. 2018) (defining the term "abandonment"). The juvenile court concluded that Mother abandoned her children under the second definition: abandonment by failure to provide a suitable home. *See* Tenn. Code Ann. § 36-1-102(1)(A)(ii) (2017).

Under the second statutory definition of abandonment, the child must have been removed from the home of a parent as a result of a petition filed in juvenile court, which ultimately results in a finding that the child was dependent and neglected.[6] *Id.* Additionally, during the four-month period following the removal of the child, the parent must "have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that [the parent] will be able to provide a suitable home for the child at an early date." *Id.* During the same four-month period, DCS must have "made reasonable efforts to assist the parent . . . to establish a suitable home." *Id.*

"A suitable home 'requires more than a proper physical living location.'" *In re Navada N.*, 498 S.W.3d 579, 595 (Tenn. Ct. App. 2016) (quoting *In re Hannah H.*, No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at *9 (Tenn. Ct. App. June 10, 2014)). A suitable home requires "[a]ppropriate care and attention . . . to the child." *In re Matthew*

---

[6] In 2018, the Legislature made significant changes to the adoption laws, including revisions to the second statutory definition of "abandonment." 2018-2 Tenn. Code Ann. Adv. Legis. Serv. 174-87 (LexisNexis). Throughout this opinion, we refer to the statutory definition effective prior to these changes.

7

*T.*, No. M2015-00486-COA-R3-PT, 2016 WL 1621076, at * 7 (Tenn. Ct. App. Apr. 20, 2016). The home must also "be free of drugs and domestic violence." *In re Hannah H.*, 2014 WL 2587397, at *9.

Here, during the relevant four-month period, DCS's efforts far exceeded any effort by Mother. *See* Tenn. Code Ann. § 36-1-102(1)(A)(ii) (providing that DCS's efforts to assist the parent "may be found to be reasonable if such efforts exceed the efforts of the parent . . . toward the same goal"). The case manager provided Father with local job listings and directed the couple to area homeless shelters and food banks. She obtained funding for Father's assessment. And she repeatedly tried to help Mother schedule her assessment. Contrary to Mother's claims, the case manager had face-to-face contact with Mother multiple times during this time period. During this time frame, Mother made no effort to address her drug addiction or mental health issues.

We further conclude that it is unlikely that Mother will be able to provide a suitable home in the near future. By the time of trial, Mother remained homeless. She had tested positive for marijuana as recently as July 11, 2018. She completed an inpatient rehabilitation program two weeks before trial. But since then, she had taken no steps to maintain her sobriety. She had been asked to leave the halfway house after only a week. And she was not participating in any type of support group while living in the homeless shelter. She was also not receiving any treatment for her mental health issues.

All the elements of the second statutory definition of "abandonment" were satisfied by clear and convincing evidence. So the trial court correctly concluded that termination of Mother's parental rights on the ground of abandonment for failure to provide a suitable home was warranted.

2. Substantial Noncompliance with Permanency Plans

The juvenile court also found Mother was not in substantial compliance with the requirements of the permanency plan. *See* Tenn. Code Ann. § 36-1-113(g)(2) (Supp. 2018). Before analyzing whether a parent complied with the permanency plan, the court must find that the permanency plan requirements that the parent allegedly failed to satisfy were "reasonable and are related to remedying the conditions that necessitate foster care placement." Tenn. Code Ann. § 37-2-403(a)(2)(C) (2014). Permanency plan requirements may focus on remedying "conditions related both to the child's removal and to family reunification." *In re Valentine*, 79 S.W.3d at 547.

The children entered foster care this time primarily for drug abuse, homelessness, and domestic violence. To address these issues, the permanency plan required Mother to pay child support; attend scheduled visits with her children; complete alcohol and drug and mental health assessments and follow the recommendations; complete domestic violence classes; avoid new criminal charges; comply with probation requirements; pass

8

random drug screens; provide copies of prescriptions; submit to pill counts; provide proof of a legal source of income; submit a transportation plan; obtain housing; complete a psychological assessment and follow the recommendations; and sign releases. We agree with the juvenile court that these requirements were reasonable and related to remedying the conditions that necessitated foster care.

Next, we must determine whether Mother's noncompliance was substantial in light of the importance of the requirements to the overall plan. *See id.* at 548-49. "Substantial noncompliance is a question of law which we review de novo with no presumption of correctness." *Id.* at 548. A "[t]rivial, minor, or technical" deviation from the permanency plan's requirements does not qualify as substantial noncompliance. *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004). Our focus is on the parent's efforts to comply with the plan, not the achievement of the plan's desired outcomes. *In re B.D.*, No. M2008-01174-COA-R3-PT, 2009 WL 528922, at *8 (Tenn. Ct. App. Mar. 2, 2009). We review the court's findings of fact concerning compliance with the requirements of the permanency plan de novo with a presumption of correctness. *See In re Valentine*, 79 S.W.3d at 547.

The evidence is clear and convincing that Mother failed to substantially comply with the requirements of the permanency plans. Mother never completed her domestic violence classes. She repeatedly failed drug screens. She incurred new drug possession charges and violated her probation. She only obtained housing for four months and was homeless at the time of trial. She never followed the recommendations from her assessment. At trial, Mother pointed to her post-petition efforts. We recognize that she completed an inpatient treatment program on August 13, passed her first drug screen on August 24, and recently found employment. While "[i]mprovement toward compliance should be considered in a parent's favor," *id.* at 549, Mother's efforts fell short in this case.

## 3. Persistence of Conditions

Next, the juvenile court found termination of Mother's parental rights appropriate under Tennessee Code Annotated § 36-1-113(g)(3), a ground commonly referred to as "persistence of conditions." *See In re Audrey S.*, 182 S.W.3d at 871. The persistence of conditions ground focuses "on the results of the parent's efforts at improvement rather than the mere fact that he or she had made them." *Id.* at 874. The goal is to avoid having a child in foster care for a time longer than reasonable for the parent to demonstrate the ability to provide a safe and caring environment for the child. *In re Arteria H.*, 326 S.W.3d 167, 178 (Tenn. Ct. App. 2010), *overruled on other grounds by In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). Thus, the question before the court is "the likelihood that the child can be safely returned to the custody of the [parent], not whether the child can safely remain in foster care." *In re K.A.H.*, No. M1999-02079-COA-R3-CV, 2000 WL 1006959, at *5 (Tenn. Ct. App. July 21, 2000).

9

There are several elements to the ground of persistence of conditions. When the termination petition was filed, the ground applied as a basis to terminate parental rights when:

The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent . . . still persist;

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent . . . in the near future; and

(C) The continuation of the parent . . . and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home[.]

Tenn. Code Ann. § 36-1-113(g)(3) (2017).[7] Each of the statutory elements must be established by clear and convincing evidence. *In re Valentine*, 79 S.W.3d at 550.

This record contains clear and convincing evidence that the conditions preventing the children's safe return persist. Mother remains homeless with no means to support her children. While she reported that she had recently been hired at Arby's, she had not yet started work. Mother's current sobriety was of short duration. We find it concerning that Mother was asked to leave the halfway house after a week and has no apparent support system. At the time of trial, she was not participating in therapy or attending any meetings. And without a full psychological assessment, it is doubtful that Mother has adequately addressed her mental health issues.

We further conclude that the evidence was clear and convincing that there was little likelihood that these conditions would be remedied in the near future. Mother has struggled with drug addiction for more than fourteen years. While her recent efforts are commendable, she appears ill equipped to maintain her sobriety on her own. Her estimate that she will be able to provide for these children in six to eight months appears overly optimistic based on her previous history.

We also have little difficulty in concluding that continuation of the parent and child relationship greatly diminishes the children's chances of early integration into a safe, stable, and permanent home. The children's foster home is a safe, stable, and

---

[7] In 2018, the Legislature made significant changes to the persistence of conditions ground for termination. 2018-2 Tenn. Code Ann. Adv. Legis. Serv. 175-76 (LexisNexis).

potentially permanent home. Mother offers only the slightest glimmer of hope that she can overcome the numerous issues that prevent integration of the children back into her life.

4. Failure to Manifest an Ability and Willingness to Assume Custody or Financial Responsibility for the Children

Finally, the court found termination of parental rights appropriate under § 36-1-113(g)(14). Under this ground, a parent's rights may be terminated if he or she

[1] has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and [2] placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

Tenn. Code Ann. § 36-1-113(g)(14).

As to the first prong, DCS must prove by clear and convincing evidence that Mother failed to manifest an ability and willingness to personally assume legal and physical custody of her children or that she failed to manifest an ability and willingness to personally assume financial responsibility for them. *See In re Ayden S.*, No. M2017-01185-COA-R3-PT, 2018 WL 2447044, at *7 (Tenn. Ct. App. May 31, 2018). Ability focuses on the parent's lifestyle and circumstances. *See In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *7 (Tenn. Ct. App. Apr. 4, 2018). When evaluating willingness, we look for more than mere words. *See In re Keilyn O.*, No. M2017-02386-COA-R3-PT, 2018 WL 3208151, at *8 (Tenn. Ct. App. June 28, 2018). Parents demonstrate willingness by attempting to overcome the obstacles that prevent them from assuming custody or financial responsibility for the child. *See In re Isaiah B.*, No. E2017-01699-COA-R3-PT, 2018 WL 2113978, at *18 (Tenn. Ct. App. May 8, 2018) (focusing on the mother's lack of effort to remove the threat of domestic violence); *In re Maya R.*, 2018 WL 1629930, at *7 (focusing on the mother's lack of effort to fulfill her responsibilities in the parenting plan).

With respect to the second prong, DCS must establish, again by clear and convincing evidence, that placing the children in Mother's custody would pose a risk of substantial harm to the children's physical or psychological welfare. *See In re Maya R.*, 2018 WL 1629930, at *7. Previously, we have described "a risk of substantial harm" in these terms:

The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However,

11

the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001) (footnotes omitted).

We conclude that terminating Mother's parental rights on the ground of failure to manifest an ability and willingness to assume legal and physical custody was appropriate. Mother did not exhibit an ability and willingness to personally assume legal and physical custody or financial responsibility for her children. At the time the petition was filed, Mother remained homeless and unemployed. She had failed all of her drug screens and had made no effort to address her mental health or substance abuse issues. Mother's lack of effort before the termination petition was filed undercuts any willingness argument. And while she claimed at trial that she was drug free and employed, she also admitted that she was currently unable to assume custody of her children. *See In re M.E.N.J.*, No. E2017-01074-COA-R3-PT, 2017 WL 6603658, at *7 (Tenn. Ct. App. Dec. 27, 2017) (concluding that the proper focus is on the parent's situation at the time the termination petition is filed); *cf. In re Maya R.*, 2018 WL 1629930, at *7 (examining evidence of the mother's conduct both before and after the petition was filed).

The evidence is equally clear and convincing that placing the children in Mother's custody would pose a risk of substantial harm to their physical or psychological welfare. The oldest child described the detrimental effect food insecurity and homelessness previously had on her sister and her. And Mother has just started on the road to recovery from a fourteen-year drug addiction. Without any support system, she faces a very real possibility of relapse. Her severe mental health issues, untreated at the time of trial, could also prevent her from caring for her children. Mother's announced intention to take the appropriate medication and sign up for therapy is insufficient to remove the very real risk of substantial harm to the children.

## B. BEST INTEREST OF THE CHILDREN

Having determined that four statutory grounds for termination were proven by clear and convincing evidence, we must determine whether termination of Mother's parental rights is in the children's best interest. Because "[n]ot all parental misconduct is irredeemable," our parental termination "statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interests." *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005). Tennessee Code Annotated § 36-1-113(i) lists nine factors that courts may consider in making a best interest analysis. In reaching a decision, "the court must consider all of the statutory factors, as well as any

other relevant proof any party offers." *In re Gabriella D.*, 531 S.W.3d 662, 682 (Tenn. 2017).

The focus of this analysis is on what is best for the child, not what is best for the parent. *In re Marr*, 194 S.W.3d at 499. "'[A] focus on the perspective of the child is the common theme' evident in all of the statutory factors." *In re Gabriella D.*, 531 S.W.3d at 681 (quoting *In re Audrey S.*, 182 S.W.3d at 878). But the analysis should also take into account "the impact on the child of a decision that has the legal effect of reducing the parent to the role of a complete stranger." *In re C.B.W.*, No. M2005-01817-COA-R3-PT, 2006 WL 1749534, at *6 (Tenn. Ct. App. June 26, 2006). Although "[f]acts relevant to a child's best interests need only be established by a preponderance of the evidence, . . . the combined weight of the proven facts [must] amount[] to clear and convincing evidence that termination is in the child's best interests." *In re Carrington H.*, 483 S.W.3d at 535.

After considering all the statutory factors, the juvenile court determined that termination of parental rights was overwhelmingly in the children's best interest. The court relied heavily on the testimony of the oldest child, who was sixteen at trial, and Mother's failure to make a lasting adjustment despite the case manager's efforts to assist her. Mother argues on appeal that the court gave insufficient weight to her post-petition efforts and the impact of her relationship with Father.

The court found that Mother had not made a sufficient change in her circumstances and living conditions to be reunited with her children and was unlikely to do so in the near future. The court found that the case manager's efforts to help Mother were more than reasonable. *See* Tenn. Code Ann. § 36-1-113(i)(1), (2). The evidence does not preponderate against these findings. The record does not support Mother's attempt to blame Father for her lack of effort. Mother had ample opportunity to avail herself of the case manager's assistance. She simply chose not to. And despite her completion of an inpatient treatment program, Mother conceded at trial that she was unable to care for her children. The trial court discounted Mother's testimony that she would be able to make a lasting change in the next six to eight months. *See Richards v. Liberty Mut. Ins. Co.*, 70 S.W.3d 729, 733-34 (Tenn. 2002) ("[F]indings with respect to credibility and the weight of the evidence . . . may be inferred from the manner in which the trial court resolves conflicts in the testimony and decides the case."). Mother's optimistic estimate was insufficient to tilt this factor in her favor.

Mother's current circumstances also impact our consideration of other statutory factors. *See* Tenn. Code Ann. § 36-1-113(i)(7), (8). A homeless shelter is not an ideal environment for the children and certainly not preferable to the stable home offered by the maternal aunt and uncle. While Mother was drug free at the time of trial, she was not participating in any support programs. A relapse would prevent her from caring for the children in a safe and stable manner. And this record is replete with evidence of

Mother's unstable mental health. Without sufficient treatment, she cannot appropriately care for her children.

Based on this record, it is plain that any meaningful relationship between Mother and her children has eroded. *See id.* § 36-1-113(i)(4). The children asked the court to terminate her parental rights. They have established a close bond with their maternal aunt and uncle, who provide them with the stability that has long been absent in their lives. Removing the children from their current environment and returning them to Mother's care would be highly detrimental to their welfare. *See id.* § 36-1-113(i)(5).

Other statutory factors also militate in favor of termination. Mother neglected her children's needs and exposed them to domestic violence. *See id.* § 36-1-113(i)(6). And her attendance at visitation was spotty. *See id.* § 36-1-113(i)(3). She missed visits due to incarceration and tardiness. And, for those she attended, she was often late.

We conclude that DCS proved, by clear and convincing evidence, that termination of parental rights was in the children's best interest. The combined weight of the proven facts amount to clear and convincing evidence that termination of Mother's parental rights is in the children's best interests.

### III.

The record contains clear and convincing evidence to support terminating Mother's parental rights. The record also contains clear and convincing evidence that termination is in the children's best interest. Thus, we affirm the judgment terminating Mother's parental rights.

_____
W. NEAL MCBRAYER, JUDGE

14